Okay, Ms. Curtis. Good afternoon, or morning, Your Honors. Martha Curtis representing the Plaintiff Appellant. So you know your job is to tell us what to do with Q clothiers, right? What to do with a Cajun Conti? Q clothiers. Cajun Conti is a different court. I'm sorry, what?          I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry.  Okay, so you have your own precedents? Yes, oh well you don't need to follow a state intermediate appellate court decision. You've said in your, I mean Q clothier of course, you have Q clothier of course you have Louisiana Bone & Joint, you have your own precedents on this issue with insurance coverage. We have to follow them. And you have to follow them under your case in Farnham where you say a state intermediate appellate court decision, one, is not sufficient for us to overcome our precedents. We have to wait for a state appellate, a state Louisiana Supreme Court decision or multiple appellate court decisions. I'm well aware of that, Cajun Conti right now, there's a petition for a hearing filed in the 4th Circuit, there's an opposition coming up. I'm well aware of your precedent, the only thing I want to say in contact with that precedent is you say you all want to wait for additional Louisiana appellate decisions. Unfortunately in this COVID-19 insurance issue, every single case gets removed to federal court. There are no Louisiana appellate decisions that come down. The only reason you have Cajun Conti is because it was Lloyds of London, which Lloyds never will reveal who their names are so you never can remove it. So it's an interesting, you know, and it may not overcome what you're saying, but it's just interesting. There's, you're never going to get any more Louisiana appellate decisions. It's interesting, but I just don't see how that. I have, I'm not arguing you to overturn your precedent, I'm just telling you the current status of where we are and I won't waste your time arguing about the issue at all. I very much appreciate that. Okay, so what we could argue though about is the claims against the agents and brokers. We could argue about that and the issue about the claims against the agents and brokers are that this is a Rule 12b-6 motion to dismiss. Your standard of review is de novo. I commend you to read our petition. I commend you to read Exhibit B to our petition, which is the summary of insurance proposal that was presented to Adler by Marsh and we have in our petition that they met with Marsh annually for years and years and years and one interesting fact too that changes this from the Newman case, factually as well, is we never received the policy until May of 2020. The policy incepts March 1st, 2020, COVID, as you know, hits everywhere in New Orleans in the middle of March 2020. So when you read Isidore Newman, one of the things they stress over and over again, and if you look at the footnote where they talk about the Harrington v. Lexington case out of the Eastern District, they say, well, this is different from that case because in that case, the policy never got the policy. If you read Isidore Newman, what comes full through in that case is that the Newman school had from their agent a policy proposal that says you have this much coverage for EEBI and it includes tuition. It says it clearly on the proposal. It said it clearly on the policy, which they got, they may have thrown it in a drawer, but they got it before Katrina and it's just on the facts of its case. On the certification issue, Marsh said in its report, said that we never raised that issue and we did in our reply. We did in our reply, we say this court should, under no review, if you need to go there to apply the appropriate 12B6 standard either on its own or by certifying the question to Louisiana Supreme Court whether Newman somehow overruled offshore products. Marsh also suggested that no Louisiana cases have ever supported the heightened duty issue. That is also incorrect. The post-Isidore Newman Louisiana state cases include the land, the bankers insurance company, which I was involved with as well as counsel for, it was Egan in that case, Eustis in that case. It's number 7741272021WL225321. It's the 24th Judicial District Court, Judge Steven Greffer. He denied Egan's motion for partial summary judgment on the duty of no heightened duty in that case for reasons orally assigned. In the transcript he said, I read both Newman and offshore and I don't see where Newman does anything to overrule offshore. It distinguishes offshore for the facts in Newman but it doesn't, in my opinion, it doesn't do anything to overrule it. That's Louisiana 24th Judicial District, Judge, page 112 of the transcript, January 8th, 2021.   . They raise the issue and talk about the issue. It's so interesting. Talking about the issue for pan demic coverage.  recommended various kinds of insurance that they had a duty to recommend pandemic coverage. They had a duty to discuss with their long-term. When did they when did when when were these conversations taking place? They took place. They took place annually and this one was and again, it's the same date as a summary proposal, which is exhibit B to our petition. I'm sorry. I couldn't go to the record excerpts. It's too long to go to the petition, but it's right behind it. There's a is the policy visa summary. They come they present the summary. They talk about it every year. They talk about it. They talk about do you want more coverage here less coverage here? You want to cover the so they're having this meeting at the end of February 2020 Marsh holds itself out and we pay premiums to them because they say I'm the greatest insurance broker in the world come to me and they don't like me citing their website, but they say on the website. We're going to recommend coverages to you. We're going to know your business your hospitality business your retail business come to us. We'll tell you how to do it, right? So you come to them and they say I don't know. Alleged that you relied on the website. We did not say we specifically relied on the website. But again, it's for the jury determined because it's the whole marketing of why would our client hire Marsh? Why do they not just go to State Farm or Allstate you go to Marsh you go to Eustis you go to Eakin you go to these people who tell you I'm an independent agent. I represent all these different lines of coverage. I telling you I know your business and why do you keep going back to them year after year after year if they don't know your business and don't know what you do and can't help you why go? Allegation in your conversations your clients conversations with the broker the agent that said I am concerned about the pandemic. I'm concerned about losses stemming from the pandemic. I need you to recommend to me cop insurance coverage. No, there is no allegation that we asked them and again, I always turn it around when a client comes to me as a lawyer. Do I say well you didn't ask me about that you come and say I'm your client advise me and you tell them I'm your great broker insurance agent. I know the hospitality business. I know the retail business. I know your business come to me pay me a premium pay me a commission and I'll advise you that's their language not mine. They say I'll recommend to you. That's their language not mine. So when you pay this to this again professional who is entitled to a one-year three-year preemption because they're professional but then they're like, well, I don't know anything about it. You should tell me you should tell me everything. I shouldn't tell you anything or I shouldn't even ask you the question in the offshore case the company or whatever was it was an offshore company. I think a maritime forget what they were doing. But when they went to the agent of the broker, whatever did they make known to the broker? I need insurance for certain things. Actually, if you read the case, it says the agent suggested to them a supplemental policy for downtime. That's right above the big quote. Everyone has under this scenario. The agent is not American suggested to them and then to the insurance cover that and then the and he suggested to them. Why don't you get downtime insurance? They said hey great. I never knew that existed, which is interesting because then do the insurance that was given in that case omit that yeah, then the agent did not get what they discussed but the agent prompted the line to this case. It would be if the agent had said to you, you know, you really should consider pandemic coverage your client said. Oh, that's a great idea. And then they didn't give it to you. It would be 100% on law on facts on that, but it's still it's our position that when they say hire me because I'm going to stay with you year after year and know your business and recommend to you coverages and they don't and again, if you read that summary of insurance, it talks about what coverage is going to get nowhere. Does it say virus is excluded, you know, and again, I'm not say virus is excluded, but if it is excluded, it should have been listed there where they listed everything else be excluded then at the back of the summary. They say here's some other kind of like a downtime. Here's some other coverages. We think you should consider nowhere. Is that at the time of this of late February 2019, but true professional who wants to be a professional who wants to hold themselves out as a nationwide in international insurance broker agent, they should be coming and making the recommendation as they say to us, not us to them. But again, we're arguing the facts. This is a 12b6 again. I do not see how this is any different from VCS, which judge didn't that tell that Brown went through painstakingly in remanded and then Sita, which the late judge Feldman went through and judge Feldman wasn't going to blindly follow Judge Brown. If he didn't think what she did was very fond of both of them. I am too. Yeah. Oh, no, they don't find it. No, they don't, they don't, they don't nothing behind you, but your own further precedent or the Louisiana Supreme Court case is directly on point, but this is a 12b. It shouldn't, you know, it shouldn't matter that we get assigned to judge Barbier Robin, judge Brown Robin, judge Feldman. There shouldn't be a difference in the Eastern District. That shouldn't mean it really shouldn't happen. I'll be happy. In this case, it won't. Okay. I mean, that's, I just, I just don't understand the argument. That's why we're here to figure out what the, what the proper standard is. I mean, I understand different judges have different views on things. Well, and, and, and the whole thing too, what I wanted to say too, in the state court, I just read to you the 2021 and you can, it's on, it's on Westlaw in the land where Judge Greffers, what I just read about and what I, what we, what's on Westlaw is the actual judgment denying Egan's motion that there is no heightened duty, but I can, if you, your honors would like, I can give you the transcript that can, it says for the reasons orally assigned, but what I just told you, but besides Judge Greffer, Judge Derensburg, who was also in the 24th JDC, made the exact same ruling on February 21st, 2020 and Parkway Presbyterian Church reinsurance underwriters on a peremptory exception, no cause of action. Again, the agent broker said there's no duty, whatever. And she said, they've alleged it on a peremptory exception, no cause of action. They've alleged enough facts. I'm not saying you're going to win, but you don't get out on peremptory exception, no cause of action, which is the same thing. You don't get out on 12B-6. It's the same standard of all inferential, all doubts ruled in favor of the plaintiff. All right. Thank you, Ms. Okay. Thank you so much. Good morning. May it please the court, Christine Gallagher from Kennedy's on behalf of Access Surplus Insurance Company. I appreciate counsel's candor that Q Clothier is binding precedent on this court. That said, Cajun Conti is wholly distinguishable from this particular case because Lloyd's, the Lloyd's policy language at issue in Cajun Conti is very different than the access policy language here. I don't believe I need to get into that. And while it is a pleasure, I'd like to cede the rest of my time to my co-counsel. Unless you have any questions. I have one. Okay. So I'm a little bit puzzled by how our rule of orderliness interacts with Erie. I'm sorry. I didn't know our rule of orderliness. So as we've noted, and as I gather both sides agree, we're bound by Q Clothier, whether it's right, wrong, or otherwise. But it is odd, isn't it? That means that we give precedence in an Erie guess to a federal decision over a state decision. I don't think it is, frankly, Your Honor, given some prior decisions of this court. This course has said on multiple occasions that you are My notes over there. I believe the case is Broussard in which this court has said that a panel must follow a prior panel and must not look into a supposed state confusion over a particular issue. Here we have Cajun Conti is by far precedent in Louisiana right now. It is but one appellate division decision in which there was a 3-2 ruling. The dissent in that case, I judge. Forgive me again. I wasn't expecting to continue, but the dissent in that case was actually written by the same judge who wrote the Witter case, which is the case that the majority in Cajun Conti relied on. And in that case, sorry, in the dissent of Cajun Conti, the judge who ruled in the dissent wrote that in Witter, there was tangible physical damage because in that case, which was a lead paint remediation, you necessarily had to destroy walls, etc, etc. But he specifically said in his dissent that doesn't happen in the context of covid. There is no physical damage and he reiterated that that is a requirement for business income and extra extra expense coverage under a commercial property policy, which is exactly what this court held in Q Clothier and in Louisiana joint and bone. And of course, that is not clearly wrong under the standards that this court has set out about the Erie Doctrine because every other federal court in this country tends so far in 74 decisions as of yesterday have ruled exactly the same way. Every other appellate court in every state other than this immediate appellate court, one of five in Louisiana has held the exact same way. I don't need to tell you that Louisiana state law is often different than the state laws in the other 49 states of our country. I'm curious how many intermediate Louisiana appellate courts would have to agree with Cajun Conti before a federal court, including a federal district court, could do otherwise to ignore Q Clothier basically. Well, Your Honor, I believe that it would have to be and actually counsel admitted that it would have to be the Louisiana Supreme Court. In your view, it could be all of the intermediate courts could say Cajun Conti is right, Q Clothier is wrong, and we would still follow Q Clothier? Yes, I believe that is correct because this court has also held that in Louisiana specifically because Louisiana law relies on code and statute and that the common law or decisions of the court are only secondary. This court has actually held that very proposition that it would have to be the Louisiana Supreme Court. And I think that frankly, that is highly doubtful given the fact that the dissent in Cajun Conti specifically explained what that judge's reasoning was in Witter, which is what the majority relied on. And now as counsel stated, there is a motion for rehearing on bunk and given the dissent in that case and what the majority relied on, I'd be very surprised that that wasn't taken. That remains to be seen. But right now, this court is bound by its precedent. All right. Thank you, Ms. Gallagher. Thank you. Mr. Raulston. Good morning. May it please the Court. Chris Raulston on behalf of the Appellee Risk Placement Services Incorporated. I'm going to address briefly the arguments and obviously we represent Risk Placement Services, the wholesale broker in this case. But with respect to both brokers, we ask that the court affirm the decision of the district court below. The district court was called upon on the Rule 12b-6 to decide whether the plaintiff, Adler, had stated facts to sustain a well-pleaded claim against the brokers. The allegations that the plaintiff made were that the brokers failed to advise about the pandemic coverage that they suggested it should have had, failed to exercise due diligence about the insured's business operations, and then failed to recommend the appropriate amount of coverage. The court examined as it should have the Isidore Newman case, Isidore Newman v. J. Ebert Eves by the Louisiana Supreme Court from 2010 and under Twombly and this court's decision in Lansone v. U.S. Wired found that there weren't enough facts alleged that would sustain, that could sustain a claim. I think that as I heard the dialogue from before, but if we look at what the Supreme Court of Louisiana said in Isidore Newman where the question of a broker's duty was explored by the court and I just look at the last paragraph of the unanimous court's ruling which says, it is not the agent's obligation to spontaneously or affirmatively identify the scope or the needs. The court also reinforced the well-settled principle in Louisiana that it is the duty or the obligation as it said of the insured to read its policy and to know its contents and I think both of those principles override the issue here which is that there was, there was a renewal over a period of years. This is not the only reason why the 12B6 was filed, there were other false positive defenses to the claim, but I believe the district court certainly got it right. There was no independent duty for either the retail broker and certainly not the wholesale broker. I understand counsel's argument to be that because this is a Rule 12B6, the district court had to accept everything we said is true and I may not win today, may not win later, but you got to let me go forward. I don't believe that's consistent with Twombly. The court doesn't have to put blinders on. Judge Barbier understood the allegation that they had a website and as Judge Duncan, I believe you noticed there was no allegation that made that they relied on that website nor frankly in any of these cases and counsel is right. Both state and federal court were dealing with this scenario and here's what's happened. Restaurant, jewelry store, medical clinic filed suit against its insurer when it determined it doesn't have coverage. It tries to make the broker the insurer and then that's what's happening here. If they don't have coverage, they say, well surely you broker should have made sure that I had the right coverage. We've also got to assume that if you had recommended it and I think your Honor asked about the offshore decision, would I have gotten it, which is another big assumption, but in any case, I don't think we have to get to the policy of the reason the Supreme Court of Louisiana said it is not the to recommend, to go out of its way, who best to know the insured's operations but the insured and then reading its own policy as it's its obligation to do and make that determination. When somebody walks into the insurance broker and I forget where RPS is and sort of the chain here. The wholesale broker, Judge. So you're one step removed from the insurance broker. We don't, we by definition don't ever have any contact with this. You're one step removed, but somebody walks into an insurance agent and says, look, I'm really, really worried about this pandemic. I heard that in Shanghai they were shutting down businesses left and right. I need your help. Does that create a heightened duty on the agent to say, you know, you really need this kind of coverage and you asked me about it, so I have a duty to tell you what kind of coverage you need. Speculating on that hypothetical, that might be different, Judge. I believe the Supreme Court did address that the agent's duty is satisfied when they procure the coverage that has been requested. So that's maybe for another day. It's certainly not what happened here. My only question, I guess to both sides, is something like that alleged in this case? There was no allegation of that, Judge. Frankly, I think you've already noticed it, Your Honor, that the offshore decision involved a case where the agent suggested this downtime coverage. The insured said, I'd like to get it and then at the end of the day, the agent didn't procure it. That was a failure of their duty. But we don't have that here. We don't have any allegation of that here. With respect to RPS, I don't see any scenario where the wholesale broker could ever be held to have some duty for someone that they frankly don't speak to, don't know, don't have any contact with. To be honest, even the website argument wouldn't apply because the insured doesn't even know who the wholesale broker is going to be until maybe after the policy is procured. I will leave time for Marsh to address more of the retail broker issues, if any. I don't think there's any need for certification. I'll just briefly mention the Supreme Court of Louisiana spoke in 2010 and I don't think it's appropriate to ask the Supreme Court whether they really meant what they said in 2010. I think everything that is needed to be decided to affirm the district court's decision is contained within the Isidore Newman-Everett Eves decision and the four corners of the complaint that the plaintiff appellant filed. We would ask that this court affirm the district court's decision. I appreciate your time. Thank you, Mr. McAuliffe. Mr. Teske, if I'm pronouncing that right? Did I pronounce that correctly, Your Honor?     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. May it please the court, Your Honors. Christopher Teske on behalf of the appellee, Marshall & McLennan Agencies. The plaintiff's claim, the central claim in this case, and the appellant's claim on the appeal is that based on the allegations in their complaint, we ought to let a jury decide what duty and what level of duty applies to their claims against the retail insurance agent, the wholesale broker. That is simply not supported anywhere by Louisiana law or any law in this country. The question of what duty applies is always a question of law to be decided by the court. And so, the issue of whether there is a heightened duty or not a heightened duty is one that Judge Barbier properly could have addressed and did address in his case and in his decision below. This court ought to affirm that decision. Now, as my colleague, Mr. Ralston, pointed out, Louisiana law, culminating with Isidore Newman, has long held that the agent does not have a spontaneous obligation to identify the coverage that its client, the insured, needs and make recommendations to the client. Offshore is different because in that case, the agent did that even though he had no obligation to do so. That's not this case. Judge Duncan asked an excellent question of Mr. Ralston a few minutes ago where he said, hypothetically, if someone had come to the agent and said, I'm worried about what's happening in China, I'm concerned about this pandemic, I hear that they're shutting down businesses in Shanghai, what should I do? Would that create an obligation on the part of the retail insurance agent to go out and find coverage for that insured? The answer to that question is simply no. At best, it would require the agent to say to the client, I can look and see if there might be insurance for that. I can ask my markets if we might be able to do something and get you a quote if they will, but it does not obligate the agent in the first instance to recommend that they go and look for that coverage. Would it be different if in response to that inquiry, the agent said, oh sure, I can find you that. Here's a product. And it turns out it doesn't cover it. That would be different, Your Honor. That would be different. It's really not offshore because the agent isn't the one recommending it in the first instance, but it's Newman. And in that case, if the agent led you to believe that it was covered, then yes, then the agent would have a problem. But that's not the case here. As you've correctly noticed, there's no allegation that they asked for the coverage. And no Louisiana court has ever imposed an obligation on an agent to do anything different than get the insured the coverage that they asked for, to get them what they requested. That's the starting point for any claim against the agent. Did you ask for the coverage? Opposing counsel concedes in her argument that there's no allegation in this complaint that they asked for pandemic coverage. Indeed, when you asked about the relationship and the communications between the retail agent and the insured in this case, and you said annual meetings don't do it. You have to show me something more. She points you to Exhibit B to their complaint, which starts at Record on Appeal, page 115. And she says, well, that's more. That's where they did something else. That's where they made recommendations. But, Your Honors, I commend to you the paragraph at the very bottom of Record on Appeal, page 115, which says, this summary of insurance is derived from information you have provided to Eustace Insurance and Benefits, including your specific coverage requests. Again, just like Louisiana law, the starting point for the quote that they received is what the insured, you, told Marsh, the agent, you needed. What coverage you wanted. As importantly, if you turn further into the back of that, which runs through Record on Appeal, page 147, there is a clear indication at page 133 that the policies being proposed are renewal policies. At page 133 of the record, there's a premium summary that compares all of the coverages that Adler had the prior year for 2018-2019 to all of the coverages that they were proposing to buy for 2019-2020. Reading that page alone, just like Isidore Newman, the insured could have easily discerned that they were not getting coverage for pandemic-related losses and could have said something and asked if that coverage was available. As importantly, if you turn further back in the record to page 140, they're advised that this doesn't cover the enforcement of ordinances or laws. If the government enforces a law and closes you down, this policy won't cover that. They're told that at page 140 of the record. So it's up to the insured, as a matter of Louisiana law, to say, I want something else. I want something different. There's no allegation that they did that. And because there's no allegation that they did that, and because my opponent concedes that they, in fact, did not, Judge Barbier's decision is manifestly correct. And so I wanted to make sure you got out all of your argument before I raised this. But I have a jurisdictional question. Certainly. Neither side is addressed. But as you know, we have to assess jurisdiction anyway. Of course, Your Honor. I understand. I'm looking at the notice of removal that Marsh filed. Yes. On page 11 of the record. And it correctly notes the legal standard for LLC citizenship. It says that we assess the citizenship of the LLC based on the citizenship of the members. But then it just says that as to these three LLCs, the annual report, et cetera, et cetera, et cetera, there's a sole member, Coleman Yadler II, who resides in New Orleans, Louisiana. And as I'm sure you know now, that residing and citizenship are different concepts. And we have precedent that says this is not an empty formalism. And the Supreme Court has precedent reversing courts of appeals for overlooking this. And so I'm curious if there's anything else in the – something else in the record that I'm missing that would show me that Mr. Adler is a citizen of Louisiana. And I see that my time has expired. I assume I may answer your question, Judge Oldham. Yes. Thank you. Well, there is something else in the record, which is the allegation in the plaintiff's complaint that Mr. Adler, the owner of the LLCs, is a citizen of Louisiana and that, in fact, he lives here. Moreover, while I understand that the court is obligated to confirm that it has jurisdiction, just as Judge Barbier was obligated to do below, Judge Barbier certainly went through that analysis and satisfied himself that he had jurisdiction over this, both in reaching his judgment with respect to Marsh and RPS and with respect to his separate ordering reasons regarding coverage under the access policy. And just briefly, does he find that Mr. Adler is a citizen of Louisiana? Off the top of my head, I don't remember his exact words, but I believe he did reach that conclusion that he was a citizen of Louisiana and that there was no question about jurisdiction. Certainly, no one here has raised an issue about this. There's been no motion to remand, for example, on the basis that he's somehow not a citizen and that he has common citizenship with any of the defendants in this case. If there's nothing else, my time has expired. We would ask you to affirm the decision below. Thank you, Your Honor. Thank you, Mr. Teske. Ms. Curtis? Time for a moment. Just to respond to Judge Holden, I believe that two Louisiana appellate decisions, given your FDIC form, if you look at that decision, it says one's not enough, but two are enough. And again, this is interesting, too, because Cajun Conte is a five-judge panel . . . Not enough to do what? For you to then look to the Louisiana state law rather than follow your president. You're saying that if the Fourth Circuit and then some panel of the Fifth Circuit or the Second Circuit, that's enough to overturn our binding published precedent? Yes, under FDIC. I looked it up last night. FDIC versus Abraham? I specifically researched this last night . . . 1998 decision? And it said that two intermediate appellate decisions were not enough, were enough. One is not enough. Neither a clearly contrary subsequent holding of the highest court of the state nor a subsequent statutory authority squarely on point is available for guidance. Yeah, I have this . . . I don't have to say unless the Louisiana Supreme Court says, no, we're changing Louisiana law, or the Louisiana legislature says, we're changing Louisiana law. Our prior precedent is binding. Is that not the case? There is . . . and I can get you the site. I looked at this last night. There is your decision that says one's not enough, but multiple is enough. You're talking about a 1998 decision written by Judge Weiner? It may be FDIC. When I realized one wasn't enough, I didn't print it out and respond it, but I did . . . I'm sorry. What sense does that make? I mean, how many . . . there are, what, five circuits in Louisiana? Well, the sense is that it's eerie. The sense is it's Louisiana law. The sense is this is federalism. The sense is that Louisiana should determine its own . . . I went to law school in Louisiana. Intermediate state appellate courts in Louisiana don't make the law in Louisiana. They don't make the law, but they inform . . . As a matter of fact, not even one decision of the Louisiana Supreme Court makes the law in Louisiana. No, it would have to be Gerstwin's Constant. And it doesn't make the law, but you are bound to go to Louisiana decisions, and you said it in this, and again, if you want me to send . . . I'm just asking, answering Judge Holden's question, and it's our position that based on your previous decisions, one is not enough, two should be sufficient. Because of federalism, because the whole point is we shouldn't have a different result if you're in Louisiana state court or in Louisiana federal court under Louisiana law. That means in diversity, this court acts like a Louisiana court, and Louisiana courts don't act like that. I don't disagree with you, Judge Duncan, that Louisiana courts go to the code and go to the Supreme Court if it's Gerstwin's Constant. I'm just telling you what this one case said that I . . . because I specifically looked this up last night in response. I said, is one state intermediate decision enough? And there is a decision from this court that says it has to be at least two or multiple.  I just want to get the summary judgment. Your time has expired now. Okay, thank you, Your Honors. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow. Thank you.